MATTER OF M/V "SNAIL'S PACE"

In Fine Proceedings

MIA-10/12.844

*Decided by Board June 2, 1982*

(1) In proceedings under section 273 of the Immigration and Nationality Act, 8 U.S.C. 1323, the term "carrier" is not used to delineate a class of persons who are liable for violations of that section, but it is used as a matter of convenience to designate the party or parties who have been charged with liability for fines.

(2) Section 273 of the Act does not make it unlawful to own a vessel that is used to bring undocumented aliens to the United States or impose a duty upon the owners of vessels to prevent their vessels from being used in that manner.

(3) Where a vessel has been used to bring undocumented aliens to the United States in violation of section 273 of the Act, it will be presumed that the owner of the vessel participated in the bringing of the aliens by permitting his vessel to be used to transport passengers to the United States, in the absence of evidence to the contrary.

(4) The owner has rebutted the presumption that he participated in the bringing of aliens to the United States, and hence is not liable for fines under section 273 of the Act, where he establishes that his vessel was chartered pursuant to a legitimate bareboat charter and that the charter was not entered into for the purpose of avoiding liability for fines under that section.

In re: *M/V "SNAIL'S PACE,"* which arrived in the United States at the port of Key West, Florida, from Cuba, on May 5, 1980. Alien passengers involved: P. ROBERTO SANTIAGO, DANIEL LUGO-ILLAS, PEDRO ALFONSO GARCIA, JOSEFA VEGA-GARCIA, et al.

BASIS FOR FINE: Act of 1952—Section 273(a) [8 U.S.C. 1323(a)]

ON BEHALF OF CARRIER:
  Richard N. Watts, Esquire
  P.O. Box 651
  St. Petersburg, Florida 33731

ON BEHALF OF SERVICE:
  Paul C. Vincent
  Appallate Trial Attorney

BY: Miihollan, Chairman; Maniatis, Dunne, Morris, and Vacca, Board Members

In a decision dated April 23, 1981, the District Director imposed administrative fines totalling $12,000 upon Robert V. Hehenberger, the captain of the vessel "Snail's Pace," and William Ermatinger, owner of the "Snail's Pace," for bringing 12 undocumented aliens to the United States in violation of section 273(a) of the Immigration and Nationality

Act, 8 U.S.C. 1323(a). Hereinafter, Mr. Hehenberger will be referred to as "the captain," and Mr. Ermatinger will be referred to as "the owner." The owner has appealed. The appeal will be sustained.

The record indicates that on or about March 11, 1980, the owner chartered the "Snail's Pace" to the captain. On or about April 22, 1980, the captain made a voyage to Cuba. The purpose of the voyage was to transport 12 Cuban nationals to the United States. On May 5, 1980, the captain returned from Cuba with 35 alien passengers, none of whom had visas or other valid entry documents.

A Notice of Intention to Fine was served upon the captain on the day of his return from Cuba. The owner was served with a Notice of Intention to Fine on October 28, 1980. These notices alleged that the captain and the owner had violated section 273(a) of the Act by bringing undocumented aliens to the United States. The owner filed a written response to the notice in which he alleged that the "Snail's Pace" had been taken to Cuba without his knowledge or consent. The owner explained that he had chartered the vessel to the captain for a period of two to four weeks for fishing along the Florida coast; that he had tried unsuccessfully to locate the vessel after the charter had expired by calling friends and relatives of the captain; that the captain had not contacted him until April 22, 1980, at which point the captain had promised to return the vessel by April 28, 1980; that the vessel had not been returned at such time; and, finally, that he had not been informed that the captain intended to use the vessel to transport aliens to the United States until after the captain had left for Cuba.

The District Director noted the defenses raised by the owner and rejected them on the ground that they were not germane because the intent, motive, or mental state of one charged with a violation of section 273 is irrelevant to a determination of liability. The District Director, referring to the owner and captain jointly as "the carrier," found that they had brought 35 undocumented aliens to the United States and that they were, therefore, both liable for $35,000 in fines for 35 violations of section 273(a). Furthermore, the District Director found that remission of the fines under section 273(c) of the Act was not warranted. However, as a matter of discretion, the District Director decided to limit prosecution to 12 of the 35 violations because only 12 undocumented aliens were originally intended to be brought to the United States by the captain.

On appeal, the owner contends that he did not "bring" undocumented aliens to the United States in violation of section 273(a) of the Act and, therefore, that he is not liable for fines. In support of this contention, the owner argues that the term "bring" in section 273(a) requires active conduct on the part of, or on behalf of, the party charged and that, therefore, liability cannot be based upon merely owning a vessel that has been used to transport undocumented aliens. The owner disclaims

234

any actual participation in the captain's voyage to Cuba. He emphasizes in this regard that his vessel was chartered to the captain pursuant to a bareboat charter on March 11, 1980, and that due to the nature of bareboat charters there was no agency relationship between them or any other basis for imputing the acts of the captain to him. The owner further contends that he and the captain do not share any legal identity and therefore that the term "carrier" should not be applied without distinction to both of them.

The Immigration and Naturalization Service has responded that owners of vessels used to bring undocumented aliens to the United States are strictly liable for fines under section 273 regardless of whether or not they participate in the bringing of the undocumented aliens. The Service would hold an owner liable despite the lack of any agency relationship or other basis for imputing the actions of a captain to the owner. Carrying this argument to its ultimate conclusion, the Service argues that an owner would be liable even if his vessel was stolen and then used by the thief to bring undocumented aliens to the United States.

The Service defines the term "carrier" as a composite of all classes of persons listed in section 273(a).[1] In support of this position, the Service cites past decisions by this Board wherein we have used the term "carrier" to refer to both the owner and captain and have applied strict liability.[2] The Service argues that it would be illogical to now hold that one part of the "carrier" (i.e. the captain) is liable and one part (i.e. the owner) is not. The Service further argues that the term "carrier" cannot be split into its separate parts without destroying its meaning. Finally, the Service argues that when the captain called from Key West on April 22, 1980, the owner knew or should have known what the captain was planning to do with the "Snail's Pace" and prevented it.

Before reaching the merits of the owner's contentions, two terms are in need of explanation. First, we must explain the significance of the term "carrier" in this context. That term does not carry the important legal significance which the Service attaches to it. "Carrier" does not appear in section 273, and we have not used it to delineate a class of persons who are liable for violations of that section. We have used it merely as a matter of convenience to designate the party or parties who have been charged with liability for fines.

The second term in need of an explanation is "bareboat charter." A "bareboat" or "demise" charter is created when the owner of a vessel

---

[1] Section 273(a) imposes liability on "any person, including any transportation company, or the owner, master, commanding officer, agent, charterer, or consignee of any vessel or aircraft. . . .".

[2] *Matter of M/V "Emma,"* 18 I&N Dec. 40 (BIA 1981); *Matter of M/V "Runaway,"* 18 I&N Dec. 127 (BIA 1981).

completely and exclusively relinquishes possession, command, and navigation of the vessel to the charterer. *Guzman v. Pichirilo*, 369 U.S. 698 (1962). "It is, therefore, tantamount to, though just short of an outright transfer of the ownership." *Guzman*, 369 U.S. at 700. The Supreme Court has emphasized that "the owner has the burden of showing such a charter. This burden is heavy for courts are reluctant to find a demise charter when the dealings between the parties are consistent with any lesser relationship." *Guzman*, 369 U.S. at 700. A leading treatise on Admiralty law states that a bareboat charter "in practical effect and in important legal consequence shifts the possession and control of the vessel from one person to another, just as the shoreside lease of real property shifts many of the incidents of ownership from lessor to lessee." G. Gilmore and C. Black, *The Law of Admiralty*, 239 (2d ed. 1975). In addition, "the most important consequences of the distinction between the demise and other forms of charters flow from the fact that the demise charterer is looked upon as the owner of the vessel *pro hac vice*. . . . The vessel, so far as third persons are concerned, is his vessel, and the men are his men; such of their defaults as are attributable to the owner and employer under respondeat superior doctrines are his to answer for." Gilmore and C. Black, *supra* at 242.

The characterization of the bareboat charterer as the owner *pro hac vice* of the vessel for the term of the charter has been repeatedly asserted by the Supreme Court of the United States in a long line of cases going back as far as 1814.[3] In *Macardier v. The Chesapeake Ins. Co.*, 8 Cranch 39 (1814), Justice Story stated that, "A person may be owner for the voyage who, by a contract with the general owner, hires the ship for the voyage, and has the exclusive possession, command and navigation of the ship." In keeping with this concept, it has frequently been held that a shipowner is isolated from liability by a bareboat charter.

With this background, we shall now consider the owner's contentions. To begin with, we reaffirm our long held position that fines under section 273 of the Act are imposed without regard to the intentions of the party charged. It is not necessary for there to be a willful disregard of United States law. Under section 273, a person who brings aliens to the United States becomes, in effect, an insurer that his alien passengers have met the visa requirements of the Act. Any bringing to the United States of an alien who does not meet those requirements incurs liability. *Matter of Swissair "Flight #164,"* 15 I&N Dec. 1 (BIA 1974); *Matter of M/V "Emma," supra*. Thus, there is strict liability for the bringing of

---

[3] *Reed v. The Yaka*, 373 U.S. 410 (1963); *Guzman v. Pichirilo*, 369 U.S. 698 (1962); *New Orleans-Belize Royal Mail and Central American Steamship Co. v. United States*, 239 U.S. 202 (1915); *United States v. Shea*, 152 U.S. 178 (1894); *Leary v. United States*, 81 U.S. (11 Wall.) 591 (1870); *Macardier v. The Chesapeake Ins. Co.*, 8 Cranch 39 (1814).

undocumented aliens. However, it is important to emphasize that before the concept of strict liability can be applied, it must be shown that the person charged with a violation of section 273 *brought* undocumented aliens to the United States. The pertinent part of section 273 states that:

> It shall be unlawful for any person . . . *to bring* to the United States from any place outside thereof . . . any alien who does not have an unexpired visa, if a visa was required under this Act or regulations issued thereunder. (Emphasis added.)

Section 273 does not make it unlawful to own a vessel that is used to bring undocumented aliens to the United States, nor does it impose a duty upon the owners of vessels to prevent their vessels from being used in that manner. *Compare* section 271 of the Act, 8 U.S.C. 1321, which provides that it shall be the duty of every person bringing an alien to the United States to prevent the landing of such alien at a port of entry other than as designated by the Attorney General. Section 273 proscribes *the act of bringing* undocumented aliens to the United States.

The owner did not participate directly in the act of bringing aliens to the United States; he did not go to Cuba and transport the aliens to the United States himself. Nevertheless, it is apparent that he was involved to some extent in that he provided the vessel which was used to bring the aliens to the United States. In the absence of evidence to the contrary, we will presume on the basis of such involvement that an owner participated in the act of bringing aliens by permitting his vessel to be used to transport them to this country. In this case, however, we find that the owner has rebutted that presumption by establishing that he chartered his vessel to the captain pursuant to a bareboat charter.

It is said that the test for a bareboat charter is one of control. Gilmore and C. Black, *supra* at 240. The fundamental inquiry is, therefore, "has the shipowner surrendered virtually complete possession, control and navigation to the nonowner (charterer)?" *Bishop v. United States*, 476 F.2d 977, 979 (5th Cir. 1973). In establishing a bareboat charter, the words of the agreement are important, though not absolutely controlling, *Complaint of Cook Transportation System Inc.*, 431 F.Supp. 437, 443 (W.D. Tenn. 1976), and in situations such as this one, where the charter is an oral agreement, its nature may be established by the circumstances of the case. *St. Paul Fire and Marine Ins. Co. v. Vest Transportation Co.*, 6 F.2d 932, 939 (5th Cir. 1982).

In this case, the captain was not employed by, or under the direction of, the owner. Nor was the captain furthering the business interests of the owner. The record shows that the owner is a haberdasher and that the captain chartered the vessel for the purpose of fishing. In addition, the crew was not furnished by the owner, and it cannot be said that the owner in any way controlled or attempted to control the vessel during the term of the charter.

237

Occasionally courts have found sham bareboat charters. In such situations the purported charter is ignored and liability is assigned to the "real" owner of the vessel. *See Stevens* v. *Seacoast Co.,* 414 F.2d 1032 (5th Cir. 1969). Here, the Service has not contested the existence of a bareboat charter or established a basis for suspecting that the bareboat charter was a sham arrangement designed by the owner to shield himself from liability for fines under section 273. It is significant in this regard that the charter was entered into on March 11, 1980, more than a month before the inception of the Cuban boatlift operation.

We find that the owner's ship was chartered to the captain pursuant to a legitimate bareboat charter and that the charter was not a sham arrangement designed by the owner to avoid liability for fines under section 273. We conclude, therefore, that the owner did not participate in the bringing of undocumented aliens to the United States aboard his vessel, the "Snail's Pace." As the owner did not bring undocumented aliens to the United States, he is not liable for fines under section 273. Accordingly, the following order will be entered.

ORDER: The owner's appeal is sustained.

FURTHER ORDER: The fines imposed upon the owner by the District Director are cancelled and the proceedings against the owner are terminated.